DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Sonny James Morries, appeals from the judgment of the Lorain County Court of Common Pleas convicting him of rape, and sentencing him to four years in prison. We affirm.
 I. {¶ 2} Appellant and the victim in this case, Angela Azzarello ("Azzarello"), met at a gas station in July 2002. Over the next few weeks, Appellant and Azzarello engaged in consensual sexual relations at Azzarello's apartment two or three times. On August 20, 2002, Appellant visited Azzarello's apartment. The two spent some time together alone in Azzarello's bedroom engaged in sexual conduct. Azzarello insists that it was not consensual. She was having problems with cervicitis and abnormal vaginal bleeding and pain that day, and claimed that Appellant threatened to hit her if she did not comply with his requests. Appellant claimed that he and Azzarello engaged in consensual sexual conduct.
 {¶ 3} On November 5, 2002, the Wayne County Grand Jury indicted Appellant with one count of rape in violation of R.C.2907.02(A)(2). Following a trial, a jury found Appellant guilty of the rape charge. The court sentenced Appellant to four years in prison. Appellant timely appealed, but this Court dismissed the appeal due to Appellant's failure to pay the required deposit or request a waiver of deposit under Loc.R. 2(C). Appellant then filed a motion to reconsider, and this Court re-opened the appeal. Appellant raises one assignment of error.
 II. Assignment of Error "The finding that [appellant] was guilty of rape, a violationof [R.C.] 2907.02 was against the manifest weight of the evidenceand contrary to law."
 {¶ 4} In his sole assignment of error, Appellant argues that his conviction was against the manifest weight of the evidence. Specifically, Appellant alleges that the evidence indicated that the sexual encounter between him and Azzarello was consensual. We disagree.
 {¶ 5} When a defendant maintains that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This court may only invoke the power to reverse based on manifest weight in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant.Otten, 33 Ohio App.3d at 340.
 {¶ 6} R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Threat of force includes any action that would cause the victim to believe that the defendant would use physical force if the victim refused to submit. State v. Schaim (1992),65 Ohio St.3d 51, paragraph one of the syllabus. One acts purposely when he either has the specific intent to cause a certain result or he intends to engage in conduct of a certain nature where that nature of conduct is prohibited by law. R.C. 2901.22(A).
 {¶ 7} The evidence in this case revealed that Appellant and Azzarello had been dating for a few weeks before the alleged rape. After meeting at a gas station during July 2002, Azzarello invited Appellant to her apartment where they engaged in consensual vaginal sex. Over approximately the next month, Azzarello and Appellant engaged in consensual sex at her apartment one or two more times.
 {¶ 8} On August 20, 2002, Azzarello's roommate, Billy Williams ("Williams") took her to the VA Clinic at St. Joseph's Hospital for a regular gynecological exam. Azzarello was suffering from pain and bleeding in her vagina which increased during sexual activity. Physician's assistant Patricia Filus ("Filus"), Azzarello's regular medical provider through the VA system, conducted both a pap smear and cervical exam. Filus determined that Azzarello suffered from cervicitis because Azzarello had abnormal discomfort and pain with movement of her cervix, and her cervix bled easily when touched with a q-tip. Filus prescribed antibiotics and gave Azzarello a pad to control the bleeding.
 {¶ 9} That same evening, around 11:30 p.m., Appellant arrived at Azzarello's apartment. Appellant and Azzarello disagreed about who let him into the apartment — she testified that Williams admitted him, while he insisted Azzarello herself did. Regardless, Appellant entered the apartment and took over an internet pool game that Azzarello was playing on the computer. Williams and another man nicknamed "Mookie" were also present at that time, watching Sports Center on the television. Appellant's and Azzarello's recollections of that evening diverge from there.
 {¶ 10} Azzarello and Williams testified that Azzarello and Appellant wrestled around playfully on the floor for about ten minutes. After that, Azzarello went into her bedroom and set the alarm for 6 a.m. so that Appellant could get to work on time in the morning. Appellant remained outside the bedroom for another ten or fifteen minutes with Williams and Mookie before joining Azzarello in the bedroom. When he entered the room, he shut and locked the door behind him.
 {¶ 11} Azzarello stated that Appellant began to take off his clothes after entering the bedroom. She, however, immediately told him that she did not want to do anything sexual with him because she was in pain. She did not want to hurt herself more by having sex with Appellant. Appellant then insisted that Azzarello could "still give [him] head." She refused. Appellant then stated that Azzarello must "[d]o it or else." Azzarello testified that she believed Appellant would hit her if she did not comply.
 {¶ 12} After she performed oral sex on Appellant for a few minutes, Appellant started to take off Azzarello's shorts. She told him to stop, but he did not. Instead, he continued removing her shorts, and penetrated her anus with his fingers. He then got on top of her and "[stuck] his private area in [her] butt, and [she] told him to stop, and he didn't stop." Azzarello kept telling him to stop, and continually hit Appellant in the stomach, but Appellant would not stop.
 {¶ 13} When Azzarello tried to move away from Appellant, he pulled her back toward him and penetrated her vagina with his penis. Azzarello told him to stop because it hurt her, but he would not. Instead, Appellant placed a pillow over Azzarello's mouth to stop her from getting any louder. Every time she tried to pull away, Appellant would pull her back to him. The pain got worse, and Azzarello could feel blood dripping down her leg. After this, Appellant again demanded oral sex, telling Azzarello that he would hit her if she did not comply. When Azzarello complied, she could taste blood in her mouth. Finally, Appellant demanded that Azzarello get on top of him, and vaginally penetrated her again.
 {¶ 14} Throughout the incident, Appellant kept telling Azzarello that "if [she] didn't listen to him, he was going to hit [her]." He also told her that "he was [her] pimp, and that he was going to roll a train on [her]." While Appellant had said similar things before, Azzarello always thought he was joking.
 {¶ 15} Appellant eventually told Azzarello to get off of him. He grabbed a towel and wiped himself off with it. Azzarello got dressed, and went to the bathroom where she wiped herself off with a towel. She insisted that she did not run out of the bedroom screaming simply because she was afraid of what Appellant would do.
 {¶ 16} Williams, Azzarello's roommate, regularly slept in the main room on the couch, though a mattress also lay on the floor in that room. Williams recalled Azzarello exiting the bathroom, limping and crying. She had not been limping earlier that day. She appeared to be in pain. She said something to him, though he could not remember what, and then she went outside with her cell phone for fifteen to twenty minutes while she called her friend Tim. When she returned, she lay down on the mattress near Williams. He remembered that Azzarello was "not sleeping, she [was] sniffling, she [was] * * * getting over the crying state or whatever. She [was] still crying, but coming off of the crying." He did not remember finding out what had happened until the next day, and indicated that he did not hear anything unusual from the bedroom though he was not really listening: "I thought they were a couple, and I decided just to mind my own business. I don't need to listen for nothing, because I didn't think it would be nothing."
 {¶ 17} Azzarello testified that when she left the bathroom she told Williams that she had been raped. Williams, however, was angry at her because she had people over late at night, and told her "to go tell somebody else who cared." She then went outside the apartment and called her friend Tim, but he was too drunk to help. She then returned to the apartment, and laid down on the mattress near Williams. She recalled Williams asking her "Why don't you go back in the bedroom with him." She told him, "No, because you don't know what happened in there."
 {¶ 18} Azzarello heard Appellant moving around the next morning. She woke up and let him out, locking the door behind him. She did not say anything to Appellant as he left.
 {¶ 19} Williams took Azzarello to work that afternoon, August 21, 2002, around 4 p.m. After arriving at work, she told a co-worker what had happened. The co-worker insisted that Azzarello call the police. When she refused, because she was still afraid of what Appellant would do, the co-worker called the police. Officer Christopher Colon responded to the call. He recalled that Azzarello was very emotional and crying. She had tears in her eyes and could hardly speak. He verified that she had not taken a shower since the alleged rape. The officer then took her back to her apartment, where he collected as evidence two towels and the shorts and panties Azzarello had worn the previous night.
 {¶ 20} Azzarello then went to the Nord Center for Rape Crisis where a rape kit was performed. She took a shower at the center, and Williams came to take her home. When she arrived home, she first noticed the blood stain on the mattress in her bedroom — no sheets had been on the bed the night before.
 {¶ 21} Detective Edward Bermudez ("Detective Bermudez") conducted the police investigation into the matter. He spoke with Azzarello on August 22, 2002 at the department and remembered that "[s]he was distraught, very non-composed, she was very quiet." After admitting to Detective Bermudez that she and Appellant had prior sexual relations, she told him what had happened the night of the alleged rape. He took photographs, including one of the blood stain on the bedroom mattress, interviewed witnesses, and submitted the towel that Appellant used to wipe himself off with for DNA analysis. The DNA analysis, when compared to a swab taken from Appellant's mouth, came back positive.
 {¶ 22} Detective Bermudez also interviewed Appellant. At first, Appellant insisted that he had not had sex with Azzarello that night. He said he was simply too tired, and that he refused to have sex when Azzarello requested it. Appellant then admitted that they may have had sex while he was sleeping, but he was not sure. Because he was unsure, he indicated that he would stick with his original answer that they did not have sexual relations that night. However, when the detective brought up the possibility of matching Appellant's DNA with the DNA on one of the towels taken into evidence, Appellant admitted to having sex with Azzarello that night. He stated that they originally began with oral sex, and then progressed from there. Appellant insisted that he was so tired that he asked Azzarello to stop. She, he remembered, was upset about that.
 {¶ 23} Appellant took the stand in his own defense at trial. He admitted to a number of prior convictions involving felonious assault with a deadly weapon while fleeing, and multiple drug abuse counts. He discussed the plea bargain he entered in the prior case. Appellant admitted that he told Detective Bermudez three conflicting stories about the night in question. He explained that:
"[He] didn't know * * * the extent of what [he] was being questioned there for, and [he] had run-ins with the law before, and it was like — [he] was on parole at that time, and just having contact with a law enforcement agency [was] enough to lose [his] parole, and * * * [he] didn't want to do time, and [he] was a little on the nervous side[.]"
Appellant denied that the threat of parole revocation would motivate him to lie in this case.
 {¶ 24} Appellant stated that he and Azzarello had sexual relations a few times, and that the last night was no different than those prior occasions. "We went through the same routine every single time, and the only thing that was different about this situation [was] the next morning when [Appellant] woke up, [Azzarello] wasn't in the room with [him]." He denied threatening to hit Azzarello, and denied that she ever told him to stop. After Azzarello let him into the apartment, and he played pool for a while on the computer, he went into the bedroom. Azzarello followed later. She entered the room, shut the door behind her and started pulling down Appellant's clothes to give him oral sex. Appellant insisted that "[r]ealistically, I was very tired and I really wanted to get it over with as quick as possible[.]" He stated that Azzarello put lotion on his hand and inserted it into her anus. After sex, he was too tired to shower, and asked Azzarello for a towel. After going to the bathroom, Azzarello returned to the bathroom to set the alarm clock for Appellant.
 {¶ 25} Appellant denied knowing anything about Azzarello's cervical bleeding problems. When asked whether Azzarello was lying about the rape, Appellant stated "[Azzarello] has been through a lot of things. She is lying, flat out."
 {¶ 26} After reviewing the evidence offered at trial, we cannot say that the jury clearly lost its way and caused a manifest miscarriage of justice. The prosecution and Appellant offered conflicting evidence. The mere fact that the jury chose to believe the testimony of the prosecution's witnesses does not render a verdict against the manifest weight. State v. Moore, 9th Dist. No. 03CA0019, 2003-Ohio-6817, at ¶ 18, citing State v.Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Accordingly, we overrule Appellant's assignment of error.
 III. {¶ 27} We overrule Appellant's assignment of error and affirm the judgment of the Lorain County Court of Common Pleas.
Judgment affirmed.
Carr, P.J. and Batchelder, J., Concur